**In re 29 NEWBURY STREET, INC., Debtor.**

**SAUNDERS & ASSOCIATES, Plaintiff, Appellant,**

v.

**29 NEWBURY STREET, INC., Defendant, Appellee.**

No. 87–2100.

United States Court of Appeals, First Circuit.

Argued April 8, 1988.

Decided Sept. 12, 1988.

Rehearing Denied Oct. 5, 1988.

Alvin S. Nathanson with whom Nathanson & Goldberg, P.C., John S. Rodman and Gargill, Sassoon & Rudolph, Boston, Mass., were on brief, for plaintiff, appellant.

Robert Owen Resnick with whom Cullen & Resnick, Charlestown, Mass., was on brief, for defendant, appellee.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

When a firm enters bankruptcy, Section 362 of the Bankruptcy Code, 11 U.S.C. § 362 (1982 & Supp. VI 1988), automatically stays litigation against it in other courts, though the bankruptcy judge may lift the stay for "cause." *Id.* In this case, Saunders Associates, a landlord's agent, asked the bankruptcy court to lift the stay to allow it to evict a tenant (the debtor in bankruptcy) called 29 Newbury Street Inc. (whom we shall call "Street"). All parties agree that the bankruptcy court need lift the stay only if, as a matter of Massachusetts law, the landlord is entitled to evict the tenant and repossess the property. Mass.Gen.L. ch. 239, §§ 1–3 (1987). The bankruptcy court refused to lift the stay, 75 B.R. 650; the district court affirmed; the landlord's agent now appeals. The basic legal issue raised is whether or not Massachusetts law permits eviction, where, in essence, a landlord, in bad faith, sent a 'rent due' notice listing an incorrect amount of rent due, while the tenant, in good faith, tried to pay the amount of rent actually due. We conclude that the law does not permit eviction, and we therefore affirm the district court.

## I.

### *Background*

The basic background facts and circumstances are as follows. (In so far as appellant, in its brief, gives an account of different facts or circumstances, we find those differences immaterial or without adequate support in the record.)

1. In 1981, Saunders entered into a ten-year lease with a restaurant called Newbury Cafe (whom we shall call "Cafe"), leasing the premises at 29 Newbury Street, on terms that the parties now apparently believe are favorable to the lessee.

2. Cafe became bankrupt. The bankruptcy court approved an assignment of Cafe's lease to Street, provided Cafe's trustee in bankruptcy would cure all defaults by paying all rent due and by replenishing the security deposit. The "closing" between Street and Cafe took place on June 2, 1986, but the parties agreed to wait until June 13, 1986 (the date they believed the appeal period would expire) to make the final financial arrangements. On June 13, 1986, the trustee in bankruptcy paid Saunders $40,000 in back rent and $10,000 to replenish the security deposit—the sum the bankruptcy court had approved as "satisfy[ing] all rental payments under the Lease through June 2, 1986." Street was responsible for June rent though it did not take full possession until June 13, 1986. The trustee had agreed to reimburse Street for rent from June 1–13.

3. On October 21, 1986, Saunders sent Street an invoice for $2,635.20 (invoice # 7161). Saunders said that Street owed that amount because of an automatic Consumer Price Index (CPI) adjustment in the lease, as applied to the lease year November 1985 to November 1986. As Saunders knew, Street was not liable for the added rent for the period November 1985 to June 1986, but it was liable for the added rent from June onwards.

4. About a month later, Saunders sent a letter to Street asking it to pay invoice # 7161.

5. On December 11, 1986, Saunders sent two more messages to Street. The first was a letter that again asked for payment of invoice # 7161, and added that "if we do not receive full payment in the amount of $2,635.20 or written legal documentation which specifically states that you are not obligated to or responsible for paying this invoice in full by 5:00 P.M. on Monday, December 15, 1986, then we will have no recours[e] but to commence a legal action to evict you from the premises for non-payment of rent."

The second was a form document headed:

"NOTICE TO QUIT FOR NON–PAY-MENT OF RENT TENANCY UNDER LEASE"

The form notified Street "to quit and deliver up in *fourteen days* from receipt of this notice" the Newbury Street premises. Under the section entitled "RENT DUE" the notice lists "*Additional Rent:* $2,635.20 11/1/85–10/31/86." The legal significance of this "notice to quit" is set forth in Mass. Gen.L. ch. 186, § 11 (1987):

Upon the neglect or refusal to pay the rent due under a written lease, fourteen days' notice to quit, given in writing by the landlord to the tenant, shall be sufficient to determine the lease unless the tenant, on or\before the day the answer is due, in an action by the landlord to recover possession of the premises, pays or tenders to the landlord or to his attorney all rent then due, with interest and costs of suit.

6. Four days later, on December 15, 1986, Street sent Saunders a check for $1,002.84, which represents the CPI amount prorated from June 13, 1986 (when Street took full possession) until October 31, 1986. Street also provided legal documentation showing that it did not take full possession of the premises until June 13, 1986.

7. Street heard nothing further about the CPI rent until January 29, 1987, when it was served with a summary process complaint alleging nonpayment of rent in the amount of $2,635.20. The answer to the complaint was due on February 17, 1987.

8. On February 11, 1987, Street filed its answer. On February 22, Saunders amended the account attached to the complaint so that, in effect, it claimed that Street owed additional money because of a "late-fee" clause in the lease (a matter to which we shall return at the end of this opinion). On February 27, before trial, Street asked the federal bankruptcy court (which had ap-

proved the assignment of the lease in the Cafe bankruptcy proceeding) to enjoin the state proceeding; the court granted the injunction.

9. On March 16, 1987, Street itself became bankrupt and entered into Chapter 11 proceedings. The automatic stay prevented Saunders from proceeding further in state court. Saunders asked the bankruptcy court to lift the stay on the ground that: because Street had failed to pay all rent owed *before the answer in summary process was due,* the lease had terminated. The court agreed with Saunders that Street had not paid quite the right amount of money. It was responsible for paying $1,080, not $1,002, for it should have paid for the first thirteen days of June and then sought reimbursement from Cafe's trustee in bankruptcy. The court nevertheless refused to lift the stay because it found that Saunders had acted in bad faith when it sent the notice to quit. Indeed, after an evidentiary hearing, the court held that "Saunders went to tremendous expense and time to obfuscate the issue of the amount of additional rent due in an attempt to extricate itself from an unfavorable lease"—a conclusion that the record fully supports. The court (and the district court) concluded that the Massachusetts courts would not permit eviction in these circumstances.

## II.

### *The Law*

■ Saunders, here and in the courts below, has pointed to the statute which says that a fourteen-day notice to quit "shall be sufficient to determine" a lease for "neglect ... to pay the rent due" unless before the day the answer is due (in an action to recover possession), the tenant pays "all rent then due with interest and costs of suit." Mass.Gen.L. ch. 186, § 11. Saunders says it is conceded that Street did not make timely payment of "all" the rent due—it did not pay the $78 in CPI rent for the first thirteen days of June, nor did it pay interest or costs of suit. Hence, the notice automatically "determine[d]" the lease and the landlord is entitled to posses-

sion. The courts below rejected this argument on the ground that a "notice to quit" sent in "bad faith" is ineffective, relying on cases such as *Oakes v. Munroe,* 62 Mass. 282 (1851) (discussing the need for precision as to *when* the tenant must quit the premises) and *McGrath v. Mishara,* 386 Mass. 74, 434 N.E.2d 1215 (1982).

We are reluctant to make so absolute a statement about Massachusetts landlord/tenant law as did the courts below, in part because the supporting case law cited is somewhat ambivalent, in part because of our reluctance to generate broad new legal principles in a matter of such intimate state concern, and in part because we find that other lines of legal authority (as the bankruptcy court itself mentioned) offer adequate legal support for the district court's decision.

Our legal conclusion is simply that the Massachusetts courts would not permit the landlord to recover the premises in a case such as this one, where the tenant is willing, able, and has made reasonable good faith efforts to pay the rent due, where the landlord has acted in bad faith in respect to the rent, and where the tenant, prior to trial of the summary process action, has asked for an injunction to stop the eviction proceedings. We rest this conclusion on three lines of authority. First, Massachusetts case law disfavors forfeitures in landlord/tenant cases. *See, e.g., Howard D. Johnson Company v. Madigan,* 361 Mass. 454, 280 N.E.2d 689 (1972) (granting equitable relief to prevent a forfeiture where tenant's breach of lease did not prejudice landlord and where the tenant, in good faith, subsequently complied); *Edward's Fine Furniture, Inc. v. DiTullio,* 356 Mass. 380, 252 N.E.2d 348 (1969) (equitable relief appropriate where delay in paying additional rent was due to "honest difference of opinion," landlord was not prejudiced, both parties had miscalculated the amount due, and tenant had acted in good faith); *Judkins v. Charette,* 255 Mass. 76, 83, 151 N.E. 81 (1926) (courts will grant equitable relief to prevent a forfeiture even if the tenant's failure to pay rent was willful); *Atkins v. Chilson,* 52 Mass. 112

(1846) (common law court has authority to stay eviction proceedings to prevent a forfeiture).

Second, at least since the time of Justice Holmes, Massachusetts law has stated that a tenant may interpose an equitable defense in a landlord's legal proceeding to recover possession. *Ferguson v. Jackson,* 180 Mass. 557, 558, 62 N.E. 965 (1902) (Holmes, C.J.) (In a summary process action to recover possession of leased property, the court found "no difficulty" in allowing the tenant to "set up ... an equitable defence." "It does not matter that the defence was not available in the Municipal Court. The equitable defence merely dispenses with the necessity for filing an independent bill." (Citations omitted).); *see Lawless–Mawhinney Motors, Inc. v. Mawhinney,* 21 Mass.App.Ct. 738, 739, 490 N.E.2d 475 (1986) (equitable defenses available in summary process); 16 *Annual Survey of Massachusetts Law* § 5.7 at 104 (1969) ("The tenant may interpose an equitable defense based upon wrongful action if the landlord sought the summary process for fraudulent or malicious motives.")

Third, Massachusetts case law has permitted a tenant upon whom a landlord has served a notice to quit to prevent the eviction, not simply *by paying all the rent owed* prior to answering a complaint seeking repossession, but also *by interposing an equitable defense. See, e.g., Howard D. Johnson, supra; Edward's Fine Furniture, supra.* Thus, Massachusetts courts permit a defense to eviction even where the tenant has not complied *literally* with the terms of the statute, for the interposition of an equitable defense before the answer is due does not constitute payment of "all rent then due, along with interest and costs of suit." Mass.Gen.L. ch. 186, § 11. Of course, in this case, the tenant raised its equitable defense 10 days *after* the answer was due; Street filed its motion to enjoin the eviction proceedings on February 27. But, we cannot imagine why that fact should make a legal difference when the state action has not been tried; it was still pending and the timing of the tenant's motion seems to have made no difference to the balance of the equities.

In sum, this is a case where eviction would work a forfeiture; the landlord acted in bad faith, the tenant acted in good faith; the tenant has been willing and able to pay any money owed under the lease; and the tenant raised these matters prior to trial of the landlord's action for repossession. In our view, Massachusetts would not permit repossession under these circumstances. Whether it would do so were the equities less obviously, or less strongly, favorable to the tenant is a matter we do not know and need not decide.

■ We have perhaps somewhat belabored the point because we have found a contrary authority, though not that of a Massachusetts state court. In a federal bankruptcy decision, *In re Players' Pub, Inc.,* 45 B.R. 387, 391 (Bkrtcy.D.Mass. 1985), the federal bankruptcy court wrote:

> While it cannot be debated that "equity does not favor a forefeiture [sic]" and that "remedial statutes are to be liberally construed", a tenant who has been served with a fourteen-days' notice to quit and against whom a summary process action has been brought may only avoid a forfeiture by complying with the specific terms of the statute.

After reviewing Massachusetts case law, however, we have concluded that this language somewhat overstates the absolute nature of the obligation that § 11 imposes on the tenant. The Massachusetts cases cited in *Players' Pub, Margosian v. Markarian,* 288 Mass. 197, 192 N.E. 612 (1934) and *Ullian v. Les Tuileries, Inc.,* 361 Mass. 863, 281 N.E.2d 229 (1972), do not stand for the proposition that the equities are *always* irrelevant, no matter how extreme the facts, and that a landlord can deliberately mislead a tenant and then oust him on a technicality. *Margosian* involved a tenancy at will, governed by Mass.Gen.L. ch. 186, § 12. The version of § 12 in effect when *Margosian* was decided did not allow the tenant to cure a default in rent. But a landlord can terminate a tenancy at will, in any event, on 30 days notice under § 12. And, a landlord willing to pursue a tenant at will to court to evict him for nonpayment

of rent is a landlord who, in all likelihood, would want simply to terminate the tenancy. To allow the tenant to cure the rent default, therefore, would likely do the tenant no good. Thus *Margosian* offers little guidance here where the tenant is under a written lease.

*Ullian*, the other case cited in *Players' Pub*, involved a tenant under a written lease. But, *Ullian* is a one paragraph rescript opinion, which does not state all the facts, and which does not say that failure to comply with the literal language of Mass.Gen.L. ch. 186, § 11 *always* automatically terminates a lease. The equities in *Ullian* may not have favored the tenant as strongly as they do here.

We therefore believe, *Players' Pub* and its cited cases notwithstanding, that Massachusetts will allow the assertion of a timely equitable defense to a § 11 action in an appropriate case, and it will prevent forfeiture of a lease where the equitable circumstances favor the tenant so strongly as they do here. *See* cases cited at pp. 427–28 *supra*.

■ The only remaining question is whether the equities are in any way changed by the following facts, which we have not yet fully described. The lease in question contains a provision that says:

> [If] tenant defaults in the payment of rent or any other payment hereunder and such default continues for a period of twenty (20) days, . . ., in addition to any and all other remedies provided in this Lease, as amended, commencing on the 21st day after such default Tenant shall pay to Landlord, without notice, additional rent in the amount of Thirty Dollars ($30.00) a day for each and every day until such time as Tenant has paid in full all such arrearages in good funds or Landlord regains possession of the premises. . . .

Saunders says that, in light of this provision, the amount that Street owed it at the time of the state proceeding (or even later) was not a trivial $78 but, rather, $30 per day since "20 days after default." It counts as the default day, in respect to the $1,080 in CPI rent owed, the date it sent

invoice # 7161, namely October 21, 1986. It notes that Street did not pay any CPI money until December 15, 1986; and it concludes that Street owed it $30 per day for 34 days (October 21 to December 15 equals 54 days, minus the 20 day grace period equals 34 days) or $1,020. Saunders adds that Street still seems unwilling to pay this amount.

We believe the "default" rent does not change the equities in any significant way for the following reasons. First, as the bankruptcy court noted, the "default" date in respect to a CPI rent claim is unclear. Since one needs government figures to calculate that rent, the tenant might reasonably have believed he was not in "default" until a reasonable time after the landlord sent its CPI rent bill (invoice # 7161). When the tenant actually received invoice # 7161 is unclear from the record, but, regardless, the "default" date could not have been as early as October 21.

Second, given the uncertainty in respect to the "default" date, the tenant could reasonably have believed it did not owe "default" money until the landlord gave some indication it expected such payment, or, at least, until considerably after November 10 (20 days after October 21).

Third, Saunders apparently did not ask for "default" money until February 23, 1987, when it sought to amend the amount in its summary process complaint.

These three circumstances, taken together, show that Street behaved reasonably in not paying the unrequested "default" money by December 15, 1984, or even by February 17, 1987, when its summary process answer was due. And, they show that it would be most inequitable to use the "default" provision as a basis for what here would be a forfeiture of the lease. Saunders points out that the lease says it need not give "notice;" but even assuming, purely for the sake of argument, that the "no notice" provision applies to CPI rent, as well as to normal monthly rent (in respect to which the tenant normally needs no notice), at most the provision, read technically (and if lawful) would give Saunders a legal right to an additional (now unspec-

ified) amount of "default" money. The provision, under the circumstances we have spelled out, would not change the basic *equities* significantly. We do not see how, given those circumstances (including the landlord's apparent failure to mention the matter until February 1987) the default rent provision could permit a forfeiture that the law would not otherwise allow.

For these reasons, the judgment of the district court is

AFFIRMED.