Wernick, J.
I.Findings of Fact
1. Raymond H. Burgess (“Burgess”), is the sole trustee of Astro Really Trust (“Astro”), which is the owner of the building and real estate located at 1500 Northampton Street, Holyoke, Massachusetts (“Property”), having acquired the real property in or about the spring of 1988.
2. The Property is a three-story building, the first floor of which is occupied by a Dairy Mart Convenience Store, an Astro Video Store operated by Burgess and a Brooks Drug Store.
3. In or about June 1985, Mortimer A. Polep and Charles L. Polep, copartners doing business as Two Annes Realty and Leasing Co., as owner, entered into a lease (the “Lease”) with Adams Drug Co. of Mass., Inc. (“Adams”), pursuant to which Adams leased the Demised Premises for use as a drug store. The Demised Premises have been used as a Brooks Store since Burgess acquired the property in 1988. The Demised Premises were approximately 15,000 square feet.
4. When Astro acquired the Property, he assumed the Lease for the Demised Premises occupied by the Brooks Drug Store.
5. Brooks Drug, Inc. was formerly known as Adams Drug Co. of Mass., Inc.
6. Since Astro acquired the Property, the corporate owners of the Brooks Drug Store have changed from Brooks Drugs, Inc. to Hooks Super- X to Reveo D.S., Inc. and finally to Maxi Drug, Inc. These entities will be collectively referred to as “Brooks” throughout this opinion.
7. Maxi Drug, Inc. (“Maxi Drug”) is currently in possession of the Demised Premises as assignee or successor in interest to RevcoD.S., Inc. (“Reveo”). Maxi Drug claims to possess the Demised Premises pursuant to an assignment of the Lease, which was executed between Maxi Drug and Reveo.
8. The Lease provides in pertinent part as follows
2. TERM:
TO HAVE AND TO HOLD said Demised Premises for a term of ten (10) years commencing on the “Rent Commencement Date" as hereinafter defined in Section 32 attached hereto and incorporated *500 herein, and terminating as of the last day of the month occurring ten (10) years thereafter, except that if the expiration date shall occur during the months of October, November or December, Tenant may, by written notice of Landlord sixty (60) days before the expiration date, elect to extend the expiration date until January 31st of the following years; with two (2) options in Tenant to further extend said term for further successive periods of five (5) years each, upon the same terms and conditions as herein contained, except for annual minimum rent, each of said options to be automatically exercised, unless Tenant gives written notice of Landlord not less than one hundred (120) days prior to the end of the current term of its intention to terminate this Lease at the end of the then current term . . .
3. RENTAL:
The tenant agrees to pay to the Landlord during the original term of this Lease, commencing as of the “Rent Commencement Date” as hereinafter defined, an annual minimum rent at the rate of Seventy-Five Thousand ($75,000.00) Dollars per year payable in equal installments of $6,250.00 each, in advance, on the first day of each month of the term, and at a pro rata rate for any fraction of a month.
In the event that Tenant does not elect to cancel this Lease as of the end of the original term, as provided in this Section, Tenant shall pay to Landlord, during the first option period, an annual minimum rent at the rate of Eighty-Two Thousand Five Hundred ($82,500.00) Dollars per year, payable in equal monthly installments of $6,875.00 each, in advance, on the first day of the month and at a pro rata rate thereof for any fraction of a month. In the event that Tenant does not elect to cancel this Lease as of the end of the first option period, as provided in this Section, Tenant shall pay to Landlord during the second option period, an annual minimum rent at the rate of Ninety Thousand Seven Hundred Fifty ($90,750.00) Dollars per year, payable in equal monthly installments of $7,562.50 each, in advance, on the first day of the month and at a pro rata rate thereof for any fraction of a month.
11. ASSIGNMENT
Tenant shall have the right to sublet the whole or any part of the Demised Premised for any lawful use, or to assign this Lease to any party or parties without the consent of the Landlord, provided that Tenant shall remain liable to Landlord for the performance of the terms and conditions of this Lease. Tenant agrees that it may not sublease the Demised Premises or assign this Lease for any use which is in violation of exclusives granted to other tenants within the Shopping Center or uses then being conducted by other tenants of the Shopping Center. Landlord agrees to supply Tenant, within thirty (30) days of receipt of Tenant’s written request, with a complete signed copy of the entire Lease containing such exclusive and use clauses and should Landlord fail to do so, this restriction shall be deemed to have been waived and Tenant may sublease or assign without regard to other tenant’s exclusive or uses. Tenant agrees that it shall give Landlord prior notice of its intention to sublease the Demised Premises or assign this Lease; provided, however, the same shall not be construed so as to give Landlord the right of approval or consent to any intended sublessee or assignee.
It is agreed that if Tenant sublets the whole of the Demised Premises or assigns this Lease for a use other than that described in Section 5 hereof, the provisions of Section 33 hereof shall become null and void and of no further force or effect as of the date such Sublessee or Assignee takes occupancy of the Demised Premises and in consideration therefor, Tenant will thereafter, for so long as such Sublessee or Assignees remains in occupancy of the Demised Premises, increase the annual minimum rent payable to Landlord by adding thereto the average amount of percentage rent paid by the Tenant for the two (2) Lease Years immediately prior to such subletting or assignment.
21. LANDLORD REMEDIES IN CASE OF DEFAULT:
It is stipulated and agreed, and these presents are upon this condition, that if any sum or sums due as rent as herein provided shall be unpaid when due and shall remain unpaid for a period of fifteen (15) days after receipt of written notice of such default has been given by Landlord to Tenant; provided, however, that in the event of any dispute between the parties as to the right of Tenant to make rental deductions pursuant to the terms of this Lease or pursuant to Law, Landlord shall not give Tenant any notice of default pursuant to this Section unless Tenant shall fail to make good to Landlord for any such deduction within thirty (30) days after receipt of notice from Landlord of a court judgment in favor of Landlord. If Tenant shall violate or be in default in its observance or performance of any of its covenants herein contained, except default in payment of rent, and shall have failed to take and prosecute appropriate steps to remedy such breach or default within thirty (30) days after receipt of written notice of such breach or default has been given by Landlord to Tenant, or if the estate hereby created shall be taken on execution or other process of law and shall not be redeemed for thirty (30) days after Tenant has received from Landlord written notice of such taking, or if any assignment shall be made of its property for the benefit of creditors, or if Tenant should commit an act of bankruptcy, then and in each of said cases Landlord lawfully may (notwithstanding any license of any former breach of covenant or waiver of the benefit hereof or consent in a *501 former instance) immediately or at any time thereafter while such default or other situation aforesaid continues and without further demand or notice enter into and upon the premises, or any part thereof in the name of the whole and repossess the same as its former estate and expel Tenant and those claiming through or under it and remove its effects (forcibly if necessary) without being deemed guilty of any manner of trespass and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant and upon entry as aforesaid this Lease shall terminate.
22. WAIVER
Failure of either party to complain of any act or omission on the part of the other, no matter how long the same may continue, shall not be deemed to be a waiver by either party of any of its rights hereunder. No waiver by either party at any time, express or implied of any breach of any provisions of this Lease shall be deemed a waiver of a breach of any other provisions of this Lease, or a consent to any subsequent breach of the same or any other provision.
26. PARTIES
The term Landlord and Tenant wherever used in this Lease shall include the successors and assigns of said parties, and if either of said parties shall be an individual or individuals, said term shall include the heirs, executors, and administrators of said parties, wherever the context requires or permits of such construction, and all of the covenants, terms and conditions herein contained shall be binding upon and inure to the benefit of other successors, assigns, heirs, executors, and administrators of said parties in the same manner as if they were expressly mentioned.
29. PARTIAL INVALIDITY:
In the event any one or more of the provisions contained in this Lease for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not effect any other provision of this Lease; and this Lease shall be construed as if such invalid, illegal or unenforceable provision has never been contained herein.
30. CAPTION
The captions are inserted only as a matter of convenience for information and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.
33. PERCENTAGE RENT:
In addition to the minimum fixed rent set forth herein, Tenant shall pay to Landlord percentage rent with respect to each Lease Year or portion thereof, during the term hereof and any extension or renewal thereof, and subject to the provisions hereinafter contained, a sum equal to the amount by which two and one-half percent (2[1]/2%) of the gross sales (as herein defined) during each Lease Year or portion thereof, exceed the annual minimum rent payable for the same period as hereinafter defined in the following paragraph; however, in no event shall tenant pay any amount of percentage rent greater than the annual fixed rent payable for the same period. The term “Lease Year,” as herein used, means each successive period of twelve (12) consecutive calendar months beginning with the date of the commencement of the term hereof, except that if such date shall occur in the midst of a calendar month, the first Lease Year shall consist of the remainder of such calendar month plus the next twelve (12) consecutive calendar months . . .
The term “Gross Sales” as used herein is defined as meaning and including (excepting, however, as hereinbelow provided) the total gross amount received by the Tenant from doing business in the Demised Premises, from all sales of merchandise, made, furnished or rendered by Tenant from the Demised Premises.
Provided, however, the following shall not be included in “Gross Sales":
a) Any refunds, credits, allowances, or discounts in any form, on merchandises sold or services rendered and merchandise returned, or exchanged by customers; provided, however, that the foregoing does not include coupon redemptions.
b) Any taxes collected from and paid by customers. This exclusion shall not apply, however, to manufacturer’s excise taxes included in the Tenant’s merchandise purchase price.
c) Receipts from any and all types of weighing scales, public telephones, coin operated slot, dispensing or vending machines, or amusement devices, or commissions or payments on account of such receipts; receipts or compensation from issuance of register checks, money orders, lottery ticket sale commissions, but not any winnings which Tenant may be entitled to as a result of having sold a winning ticket, or the like; payment for collection of public utility bills; merchandise returned to shippers or sellers; sales of trade fixtures or other store equipment; any sums received in any settlement of any claim of loss or damage; interest on sales made on credit; the exchange of merchandise between stores of the Tenant or any affiliate of the Tenant; and the amount of sales to employees of Tenant in the premises at a discount.
d) Sales of tobacco products and candy.
e) Sales of prescription drugs under any third-party paid prescription program under which Tenant is reimbursed by someone other than the *502 recipient, except that the foregoing shall be includable by Tenant in the amount actually received by Tenant and when actually received by Tenant.
The Tenant shall keep at its principal office, located at 75 Sabin Street, Pawtucket, Rhode Island, accurate books and records conforming to usual accounting practice, showing the amount of the Tenant’s gross sales (as above defined) in the Demised Premises. Such records and all subsidiary and supporting records, including copies of sales tax reports (if any) shall be produced and made available for inspection and audit by the Landlord or its representatives at the Tenant’s principal office from time to time during regular business hours, upon reasonable advance notice to the Tenant, but not more than once in any Lease Year. The Tenant shall have the right to destroy its records in accordance with its usual practice in keeping and destroying records, provided such destruction does not occur within two (2) years after the end of any Lease Year. In the event an audit by Landlord reveals that Tenant has understated its sales by three (3%) percent or more, Tenant shall pay Landlord’s actual reasonable cost of such audit.
The Tenant shall furnish to the Landlord, at the address at which payments are made to it, within sixty (60) days after the completion of each Lease Year during the term of this Lease, or any extension thereof, and within sixty (60) days after the termination of the Lease term, a statement certified to be true and correct by an Officer of Tenants, of the Tenant’s gross sales (as hereinabove defined) in or from the Demised Premises for such period. Any information obtained by Landlord pursuant to the provisions of this Section shall be treated as confidential, except in litigation or arbitration between the parties. Any claim for mistake or error in the statements furnished by Tenant shall be made in writing within one hundred eighty (180) days from the receipt thereof; and if no such claim is made, the same shall be conclusive and binding on both parties; if any such claim is filed within the aforesaid period, Landlord shall commence an audit within thirty (30) days of making such claim and shall complete the same as quickly as possible.
Such percentage rent, if any, shall be paid simultaneously with the delivery of the statements above referred to, and mailed to Landlord at the address hereinafter provided, or to such other address as Landlord may from time to time in writing designate.
35. In the event that there is any litigation between Landlord and Tenant based on an alleged default of the terms and conditions of this Lease, it is agreed that the successful party in such litigation shall have the right to recover from the other party the reasonable costs of its legal fees pertaining to such litigation.
9. At the time Astro assumed the Lease, it did not negotiate any of the terms of the Lease, nor did Brooks Drug, Inc. or any of its subsequent assignees.
10. On April 26, 1991, Brooks’ representative, Elaine Bardsley, sent to Burgess a certified statement of Gross Sales for the lease year ending in March 1991, pursuant to paragraph 38 of the Lease. Burgess received this statement on or about that same date and did not make any claim of error of any kind with respect to it in writing or otherwise within 180 days of receipt of the statement.
11. By letter dated April 24, 1992, Brooks’ representative Anita Bowen, sent to Burgess a certified statement of Gross Sales for the year ending March 1992, pursuant to paragraph 33 of the Lease, which was received on or about that date by Burgess. Burgess did not object and did not make any claim of error of any kind in writing or otherwise with respect to this statement within 180 days of its receipt'.
12. On April 26, 1993, Anita Bowen sent Burgess a statement of Gross Sales for the Lease year ending March 1993 which Burgess received on or about that date. This statement was not certified. Burgess did not make any claim of error with respect to this statement within 180 days of its receipt, but in July 1994, he objected to the statement on the grounds that it had not been certified. A certified statement was prepared by Ms. Bowen dated July 19, 1994, using the same numbers as the original April 26, 1993 statement, and was forwarded at that time to Burgess. This statement was received by Burgess on or about July 19, 1994.
13. Also on or about July 19, 1994, Anita Bowen sent to Burgess a certified statement for the year end March 19, 1994, pursuant to paragraph 33 of the Lease. This statement was received by Burgess on or about July 19, 1994.
14. By the time Burgess received these statements on or about July 1994, he had come to believe that the fair rental value of the Demised Premises was $1,000.00 a day, or $365,000.00 per year. The rent under the Lease was $75,000.00 for the first ten years of the Lease, the tenant having the right to extend for two successive five year periods. Base rent increased under the Lease to $82,500.00 during the first five year extension and to $90,750.00 per year under the second lease extension. The percentage rent under the lease was capped at an amount equal to the base rent. If Burgess was correct in his assessment of the fair rental value of the Demised Premises, Astro stood to loose substantial sums over as many as eleven more years, even if the maximum percentage rent was paid each year. In fact, however, no percentage rent had ever been paid under the Lease, because sales as reported to Burgess by Brooks had never exceeded the 3 million dollar threshold. ($3,000,000 equals the *503 annual minimum rent during the year at issue ($75,000) divided by 2V2 percent.)
15. Burgess also believed that the Gross Sales from the Demised Premises over the last four years, even though increasing by approximately 25% over that period, appeared to be increasing at a slower pace than growth of sales of the other tenants of the property, including his own video store.
16. Burgess consulted his attorney, Paul Malek, who wrote to Brooks on or about August 8, 1994, requesting an audit of Gross Sales for Lease years ending March 1994, 1993 and 1992. (The letter incorrectly refers to certifications on July 19, 1994foryears ending March 1993 and March 1992. The July 19, 1994 certifications were for the years ending March 1994 and March 1993.)
17. The audit was conducted by David C. Morton, a certified public accountant, who had been Burgess’ accountant for many years. It was done at the corporate headquarters of Brooks Drug in Pawtucket, Rhode Island. The audit was performed in two stages. The years ending March 1993 and March 1994 were audited first in August and/or September 1994 and, thereafter, in September and/or October 1994, the years ending March 1991 and March 1992 were audited.
18. Morton had never done an audit of this type before of a retail drug store and, therefore, brought Robert Ashe with him, who had experience performing audits of this type.
19. By letter dated October 20, 1994, sent registered mail next day service, to Brooks Drug, Inc. and Reveo D.S., Inc., Malek on behalf of Astro, notified them that they were in default under the Lease for nonpayment of rent. Attached to Malek’s letter were copies of Morton’s audit reports for each of the years in question. These reports stated that a total of $94,483.00 in percentage rent was owing as follows:
1994 - $45,998.00
1993 - $30,047.00
1992 - $13,698.00
1991 - $ 4,740.00
The letter also stated that Gross Sales had been under reported by more than 3%, and therefore, that the Tenant was responsible to pay for the cost of the audit. The letter did not include a bill for the audit. The letter demanded immediate payment of the $94,483.00. The letter concluded “(Y]our failure to pay Percentage Rent Due in accordance with paragraphs 21 and 33 of the Lease, shall result in the termination of the Lease altogether.”
20. The reports attached to Malek’s October 20, 1994 letter had been prepared by Morton after he had reviewed the results of his audits with Burgess. Morton knew, furthermore, as a result of his conversations with Burgess, that the reports would form the basis for a claim of past due percentage rent under the Lease.
21. Reveo received the October 20, 1994 letter on October 21,1994.
22. Burgess had been surprised and concerned to learn from Morton’s audit a number of facts, including the following:
a. In each of the years audited by Morton, Brooks claimed as a deduction from Gross Sales, for percentage rent purposes, the total retail value of total shipments to the store of tobacco products, candy, hard candy and direct vendor deliveries. In other words, Brooks was deducting from Gross Sales, not the actual sales of such products, but rather an estimate of such sales based upon the total retail value of shipments of such products to the store. Brooks was not adjusting these total shipments for refunds, shrinkage, discounts, bad checks, or merchandise returned to vendors because unsold. Likewise, Brooks was not attempting to estimate its actual sales by examining its opening and closing inventories at the store for each of the years in question. During the years audited by Morton, Brooks owned between 400 and 450 drug stores. None of these stores, during that period, was able to track exact sales of candy, tobacco or hard candy due to the configuration of the cash registers used by Brooks. With all of its leases in which Brooks was required to calculate sales of candy, tobacco and hard candy for percentage rent purposes, Brooks had used the same method it was using under the Lease, namely amount shipped in retail dollars. This was Brooks’ usual method of accounting for sales of these items for percentage rent purposes. Morton requested and received verification of these shipments. He also requested any documentation of actual sales of these items. No such documentation was furnished to him by Brooks, because no such documentation was maintained by Brooks. Morton did not request, and therefore did not receive, inventory records of Brooks with respect to these items.
b. In each of the Lease years in question, Brooks deducted all third-party prescription sales from Gross Sales, whether or not reimbursed by third-party payors during the Lease year.
c. During each of the years audited by Morton, Brooks had sublet 2,600 sq. ft. of the Demised Premises to Subway Sandwich Shops, Inc. (“Subway”) and had not included in Gross Sales the sales made by Subway.
d. For the Lease years ending 1992, 1993 and 1994, Brooks had deducted estimated amounts for credit card fees from Gross Sales. Brooks was unable to provide Morton with any documentation of these fees.
e. For the Lease years ending 1993 and 1994, Brooks had deducted bad checks/debts from Gross Sales.
*504 f. For the Lease year ending 1994, Brooks had deducted from Gross Sales all sales of Peter Pan Bus Line tickets, including Brooks’ commissions on such sales.
g. There was a discrepancy for the Lease years 1993 and 1994 between Gross Sales as stated in the general ledger of the store and Gross Sales as reported from the store to the home office of Brooks. Morton was told by Bowen that this discrepancy resulted from refunds. Books had not included the amount of these refunds in Gross Sales.
h. The sublease between Brooks and Subway was dated November 10, 1987. (Exhibit 2B.) This sublease also includes a percentage rent clause which requires Subway to provide, within 30 days after the end of each sublease year, a complete statement certified by an Independent Certified Public Accountant acceptable to the sublessor and also certified by sublessee or on its behalf by a duly authorized officer or representative, showing accurately and in reasonable detail the full amount of sublessee’s gross receipts in, on, or from the sublet premises during the immediately preceding sublease year. (Paragraph 3B.)
j. Brooks’ deductions of amounts for bad checks/debts and refunds resulted in doubling the deduction from Gross Sales with respect to tobacco products, candy, hard candy and direct vendor deliveries, because Brooks had already deducted the full amount of the retail value of all shipments of those items received at the store.
23. Morton had requested Brooks to provide figures for Subway’s sales, but Brooks did not do so. Morton did not contact Subway himself, or take any further steps to verify or to obtain sales figures for Subway. Subway, however, by letter dated May 3, 1993, reported to Brooks that, during the preceding lease year, it had sales in excess of $300,000.00 for the first time. Subway reported that its sales for the period ending March 30, 1993 were $329,087.82. For the year ending March 30, 1994, Subway reported sales of $349,501.00. These statements were not the certified statements called for by the sublease between Subway and Brooks. No evidence was presented whether such certified statements had ever been received by Brooks. Brooks did not make available to Morton or to Astro these sales figures from Subway until after October 20, 1994.
24. After consulting with Burgess, Morton prepared his reports in which he concluded that all of the deductions by Brooks for candy, hard candy, tobacco and direct vendor deliveries should be disallowed in full. His reasoning was that the value of retail shipments was not a reasonable method of estimating actual sales of these items and that Brooks was unable to provide him with any additional information from which a more accurate approximation of such sales could be made. It was Morton’s opinion that Brooks had the obligation to prove the value of any deductions from Gross Sales and that, since it could not do so, and could not provide Morton with information from which he could reasonably approximate the actual sales of these items, the deductions had to be disallowed in total.
25. Morton also disallowed in its entirety the deduction of sales of Peter Pan tickets, believing that there was no basis for deducting that item under the Lease.
26. Morton likewise disallowed any deduction for credit card fees, based upon his opinion that the Lease did not permit deduction of this item.
27. Morton disallowed the full amount of the difference between Gross Sales as reported in the general ledger and the total amount of such sales in the weekly reports to the home office. Morton had been advised by Ms. Bowen that the difference constituted refunds, which were an excludable item under Section 33 of the Lease, but Morton did not accept this explanation, because he was not supplied with any documentation to support it.
28. Morton also disallowed in its entirety the deduction from Gross Sales by Brooks for bad checks. Morton had determined from Brooks that its practice was that any bad checks that were redeposited were credited to Brooks; but not credited to the particular store from which they had come. Since Brooks was unable to provide Morton with documentation of the bad checks which had come from the store in question and which were redeposited and ultimately cleared, Morton disallowed the deduction entirely.
29. Morton also disallowed in its entirety the deduction taken for third-party prescription sales. It was Morton’s opinion that the Lease required that portion of third-party prescription sales that was actually reimbursed by the third-party payors to be included in Gross Sales. Since Brooks could not provide Morton with documentation of those third-party prescription sales which were reimbursed during the lease years in question, Morton disallowed the entire deduction.
30. Finally, since Morton was not provided with any information upon which he could determine what the sales from the Subway stores had been during the periods in question, Morton estimated the amount of those sales. He did so by calculating the sales per square foot from the Brooks store at the Demised Premises for each Lease year in question and applying that figure to the square footage occupied by the Subway store, i.e. he multiplied the sales per square foot by 2,600 to estimate the annual sales from the Subway store. Morton then included in each of the years in question the resulting number for that year. There is no generally accepted accounting principle supporting this method of estimating Subway’s sales.
31. By letter dated November 4, 1994, Brook’s corporate attorney, Kenneth Lohiser, advised plaintiff’s attorney that Brooks was offering $33,158.00 to Astro in settlement of Astro’s claim for percentage rent. Mr. Lohiser considered this as a *505 counteroffer to Astro’s demand. He expected and invited further negotiation. Consequently, no check was included with this letter. The letter was received by Astro on or about November 7, 1994.
32. In the November 4, 1994 letter Mr. Lohiser explained the difference between the weekly sales reports of the store and sales per the home office worksheets as attributable to adjustments to third-party sales which were previously included in Gross Sales, but had since been rejected or adjusted by third-party payors. The Court finds as a fact that this was the reason for the discrepancy. He explained that Brooks’ practice with respect to accounting for candy, tobacco, hard candy and direct vendor deliveries was the accepted practice in the industry and refused to agree to the inclusion of any of those items in the recalculation of percentage rent. He acknowledged that an error had been made with respect to the exclusion from Gross Sales of sales of third-party prescriptions, because the Lease differed from all other Brooks’ leases by requiring inclusion of third-party prescription sales when payment is actually received by the tenant from the third-party payor, rather than excluding all third-party prescription sales. He stated that 5% to 15% of third-party prescriptions are rejected or adjusted by the third-party payor, but he agreed for purposes of resolution to include the full amount of third-party prescription sales in Gross Sales. With respect to Subway sales, Mr. Lohiser’s position was that Gross Sales did not include Subway sales. He stated, however, that he would be willing to drop the argument, if agreement could be reached regarding recalculation of percentage rent. As to the other amounts included in David Morton’s letter, Mr. Lohiser stated that they were “not being objected to at this time.” Finally, Mr. Lohiser offered to pay “the actual reasonable cost” of Morton’s audit in addition to the $33,158.00. He concluded by requesting that Mr. Malek contact him “so that we can resolve this matter.”
33. Rather than contacting Mr. Lohiser, Astro made entry into the Brooks Drug Store for the purposes of terminating the Lease on November 9, 1994. The next day, on November 10, 1994, Mr. Malek on behalf of Astro, wrote to Mr. Lohiser advising him that the Lease had been terminated and accusing Brooks of fraud in the reporting of percentage rent, demanding payment in full of the $94,483.00 and inviting Brooks to negotiate the terms of a new lease. The letter accused Brooks of violations of General Laws, Chapter 93A, as well.
34. This letter was received on November 11, 1994 and on that same date, Brooks delivered to plaintiff a check in the full amount requested, $94,483.00, reserving all rights to contest the amount of percentage rent and stating that the sole purpose of rendering payment was to cure any default prior to repossession.
35. On November 18, 1994 plaintiff deposited Brooks’ check and endorsed it “without prejudice and reserving all rights and not to be considered as settlement in full.”
36. By letter dated November 14, 1994, W. Malek wrote to Mr. Messier of the Douglas Maxi Drug Company (which owned the Brooks Drug Store as of November 14, 1994) that “the landlord can begin negotiations for a new lease with Maxi Drug or CVS, which has already shown a very genuine interest in the property and has again recently called me to confirm their interest.”
37. The instant summary process action was commenced on or about December 2, 1994.
38. Throughout the entirety of the course of dealings between Burgess and Brooks (regardless of corporate ownership), Brooks had always timely paid the base rent required under the Lease, its share of common expenses in connection with the Property and its share of utilities and taxes.
39. There is no evidence of any request to audit Brooks’ sales, other than the request submitted» by Burgess by the letter of August 3, 1994.
40. Mr. Lohiser conceded at trial (by his deposition testimony read into evidence) that bad checks and debts should not have been deducted from Gross Sales; that Peter Pan sales and commissions should not have been deducted from Gross Sales; and that credit card fees should not have been deducted from Gross Sales. He also agreed that it was error to deduct all third-party prescription sales and that only that proportion of those sales which were actually reimbursed by the third-party payor should have been deducted. He offered no testimony, however, as to the amounts actually paid by third-pariy payors during the years in question and there was no other evidence of these amounts.
RULINGS OF LAW AND ULTIMATE FINDINGS OF FACT I. INTERPRETATION OF THE LEASE
Interpretation of the Lease is required to resolve a number of issues in this case. Astro claims that part 21 of the Lease permitted Astro to terminate the lease after rent remained unpaid by Brooks for fifteen days following receipt by Brooks of written notice of default. Notice of default for unpaid rent was received by Brooks on October 21, 1994. It is undisputed that Brooks did not pay any further rent within fifteen days of receipt of this notice.
Part 21 does not explicitly state the consequences of failing to pay the unpaid rent within fifteen days of receipt of notice of default. Through an error in draftsmanship or typing, the first sentence of Part 21 is incomplete and unintelligible. It provides for notice of certain types of defaults (fifteen days for unpaid rent and thirty days after notice of a Court judgment in favor of the Landlord for rental deductions made by Tenant), but it never states what right(s) the Landlord has if the default is not cured within the notice period. The rest of Part 21 addresses all defaults or violations of covenants by Lessee other than nonpayment of rent. This sentence of Part 21 provides for notice in some instances and not *506 in others. It affords the Landlord a remedy of self help, including, but not limited to, termination of the Lease by entry, in addition to any other remedies provided by law to the Landlord. Astro purported to exercise this remedy by entering the Demised Premises on November 9, 1994 and terminating the Lease.
Although the first sentence of paragraph 21 is meaningless as written, that is not the end of tihe matter. This is a complex lease between commercial entities. It cannot be lightly assumed that they intended paragraph 21 to be meaningless as applied to unpaid rent. Rather a commercial lease must be construed “in accordance with the common sense interpretation required for contracts in general, as a business transaction entered into by practical people to accomplish an honest and straightforward end.” Fleet Nat. Bank v. H&D Entertainment Inc., 96 F.3d 532 (1st Cir. 1996). A contract must be construed as a coherent whole. “Every phrase and clause of a contract must be presumed to have been designedly employed and must be given meaning and effect whenever practicable, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the parties’ intent. ” G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co. 669 N.E.2d 787 (Mass.App.Ct. 1996).
Considered in the context of all of the other provisions of the Lease and the law in effect at the time the Lease was drafted, Part 21 appears most likely intended to provide the Landlord with a remedy not otherwise available, unless expressly provided in the Lease; the remedy of termination by entry and self help. See Gidwani v. Wasserman, 373 Mass. 162, 166 (1977). That is precisely what the second sentence of Part 21 accomplishes for all defaults and violations of covenants other than default in payment of rent. The caption of the paragraph is “Landlord Remedies in Case of Default.” While Part 30 of the Lease provides that captions “in no way define, limit or describe . . . the intent of any provision hereof," the Court, nevertheless, rules that the body of Part 21 appears to be consistent with the caption of Part 21. There is no good reason to provide the Landlord with the right to terminate the Lease by entry and self help for every default and violation of covenant other than unpaid rent but not also for default for unpaid rent, which goes to the very essence of the consideration for the Lease. The Court concludes, therefore that the first sentence of Part 21 was not intended to be an entirely separate sentence, but rather a subpart of the larger sentence specifying all the events of default and the notice requirements, if any, for each default and permitting such defaults to be remedied by termination of the Lease by the Landlord through entry and/or self help. In other words, the Court concludes that the intent of the parties was that there was to be no period at the end of the first sentence, but only a comma; and that the word “If,” at the beginning of the second sentence, was not intended to be capitalized.[1] Astro therefore had the right under the Lease to terminate the Lease by entry for rent which remained unpaid fifteen days after Brooks received notice of default.'[2]
The next issue of interpretation of the Lease concerns the sublease to Subway. The precise issue is whether sales by Subway from the portion of the Demised Premises sublet to Subway are includable in Gross Sales.[3] Gross Sales is defined in Part 33 as
The total gross amount received by the Tenant from doing business in the Demised Premises, from all sales of merchandise, made, furnished or rendered by Tenant from the Demised Premises.
Subway’s sales do not represent an amount received by the Tenant. Tenant is defined in the Lease as Brooks. The term is not defined to include sublessees of Brooks. (Part 26.) Requiring Brooks to include Subway’s sales in Astro’s Gross Sales would require Brooks to pay percentage rent on money it never even received. The explicit language of the Lease, as well as principles of reasonableness and fairness, are contrary to any such result. The definition of Gross Sales, furthermore, makes it abundantly clear that Gross Sales are limited not just to amounts received by Brooks; but also to such amounts as were derived from sales of merchandise by Tenant (Brooks). Subway’s sales are not sales of merchandise by Brooks.
Astro argues that Part 11 of the Lease supports inclusion of Subway’s sales in Gross Sales. The Court, however, concludes that Part 11 of the Lease actually supports the exclusion of such sales from Gross Sales. Part 11 proves that subleasing was clearly contemplated by the parties. It was explicitly permitted within certain parameters, without the requirement of the Landlord’s consent. The original parties to the Lease did not define ‘Tenant” to include subtenants and did not provide for any adjustment to the Tenant’s percentage rent or to Gross Sales in the event less than the entire Demised Premises was sublet. They provided a formula for rent recalculation only if the entire Demised Premises was sublet.[4] Under these circumstances, the Court declines to rewrite the Lease to permit a result that is neither required by the explicit terms of the Lease, nor reasonable, nor fair. The Court concludes that the term Gross Sales does not include Subway sales for the purpose of calculating percentage rent.
The next issue of interpretation of the Lease concerns how sales of tobacco products, candy, hard candy and direct vendor deliveries are to be determined for purposes of excluding such sales from the Gross Sales used to calculate percentage rent. The Lease excludes all such sales from Gross Sales and requires Tenant to “keep . . . accurate books and records conforming to usual accounting practice, showing the amount of Tenant’s gross sales ... in the Demised Premises. (Part 33.)
Brooks kept no records of its actual sales of these products. Brooks did keep records of shipments of these products to the Demised Premises, from which it could *507 determine the retail value of all such products shipped and/or delivered to the Demised Premises. Brooks deducted from Gross Sales for each Lease year the total retail value of these products delivered to the Demised Premises. Brooks’ reason for doing so was its inability to track actual sales at its stores, because the cash registers it used did not have a separate key for any of these items. Since this was Brooks’ usual practice under each of its percentage rent leases in effect during the years in question, Brooks, in good faith, believed it was an appropriate practice under the Lease.
Astro, however, contends that the Lease permits only “actual sales” to be deducted. It argues that keeping records of shipments did not constitute keeping accurate records of actual sales of these products conforming to good accounting practice, as required by the Lease. Astro further claims that, even if the Lease permitted actual sales to be estimated, the total retail value of shipments is not a reasonable basis for estimating the amount to be deducted from Gross Sales for purposes of calculation of percentage rent. The total retail value of goods received method of estimating sales has the potential substantially to overstate such sales, resulting in an understatement of the Gross Sales upon which percentage rent is calculated. The method fails to account for unsold merchandise, returned merchandise, discounts, shrinkage or bad checks. When this method is used to determine a deduction from Gross Sales, deductions are double counted. The Lease permits refunds and bad checks to be deducted from Gross Sales. Yet the amount of any such refunds and bad checks is already included in the deduction for the total retail value of shipments.
While Brooks presented evidence that the retail value of shipments method of estimating sales was in accordance with generally accepted accounting principles, the Court finds that the method is not a reasonable one for estimating such sales under the Lease. There was no evidence that the original tenant under the Lease was incapable of tracking sales of these products, or that the Landlord was aware at the time the Lease was executed of any such practice by the Tenant of estimating sales in this manner. There was no evidence of any agreement to this method of estimating sales, or that the method was even within the contemplation of the parties at the time the Lease was executed. Under these circumstances, the Court concludes that the Lease requires the Tenant to employ, at a minimum, a method of determining sales that is reasonably accurate and that is not inherently likely to result in an overstatement of such sales.
One such method was available to Brooks, because Brooks maintained yearly opening and closing inventory records for tobacco, candy, hard candy and direct vendor deliveries. Actual sales of these items could more accurately have been estimated based upon the total retail value of goods shipped in comparison to, or adjusted by, beginning and ending inventories and shrinkage. This method of estimating sales is in accordance with generally accepted accounting principles. Indeed Brooks’ own accounting expert conceded that he would prefer not to estimate the value of goods sold as Brooks did, but would rather use this inventory method.[5] The Court concludes, therefore, that the total retail value of goods shipped method of estimating sales of tobacco, candy, hard candy and direct vendor deliveries was an impermissible means of determining such sales under Part 33 of the Lease.
The final issue of interpretation of the Lease concerns Part 33 and, in particular, the following sentence: “[A]ny claim for mistake or error in the statements furnished by Tenant shall be made in writing within one hundred eighty (180) days from receipt thereof; and if no such claim is made, the same shall be conclusive and binding on both parties ..." On April 26, 1993, Brooks mailed to Astro an uncertified statement of Gross Sales for the 1993 Lease year. On or about July 19, 1994, Brooks sent a certified statement of such Gross Sales to Astro. The question is whether the 180-day period began upon receipt of the April 26, 1993 uncertified statement, or upon receipt of the July 19, 1994 certified statement.
Brooks contends that the failure to certify the April 26,1993 statement is a mistake or error in the statement which Astro had to assert in writing within 180 days of receipt of the statement. Astro contends that certification of the statement is a condition precedent to commencement of the 180-day period. Astro is correct. Claims of “mistakes or errors in the statements” refers to substantive mistakes or errors, not to mistakes or errors in procedure or form. The event which triggers the 180-day period is receipt by Astro of a certified statement of Tenant’s Gross Sales. Until such statement is received, the 180 days does not begin to run.[6]
II. BROOKS’ CLAIM FOR OVERPAYMENT OF RENT
The Court next addresses Brooks’ claim that it has overpaid percentage rent. There are several issues involved. Each will be addressed. ■
A. Claims of Unpaid Percentage Rent for Lease Years 1991 and 1992
Under the clear and unambiguous language of Part 33, Astro was barred from asserting such claim by having failed to assert them within 180 days of receipt of the certified statement of Gross Sales for each such Lease year. Astro attempts to avoid this result in two ways. First, it claims that the Lease requires Astro to repose its trust and confidence in the truthfulness of Brook’s annual certifications of Gross Sales and, therefore, that Brooks and Astro share a fiduciary relationship. The mere existence of a percentage rent clause which requires Tenant to certify its Gross Sales annually to the Landlord does not convert the relationship of commercial Landlord and Tenant into a fiduciary one. Indeed, the Lease affords the Landlord the *508 right each year to audit the Tenant’s books and records to verify for itself the accuracy of Tenant’s certifications. The Lease does not leave the Landlord at the mercy of the Tenant as Astro argues.
Second, Astro claims that the certifications for the 1991 and 1992 Lease years were not only untrue, but fraudulent. The Court concludes, however, that, although that there were errors in these statements, such errors were not the result of fraud.[7] Six errors were claimed for 1991. One was the failure to include Subway sales. As already discussed, Subway sales were not includable in Gross Sales.[8] Four others were the use of the total retail value of shipments for estimating sales of candy, tobacco, hard candy and direct vendor deliveries. The Court has concluded that this method was not permitted by the Lease. Nevertheless, the Court concludes that the use of the method was not fraud. Brooks used it in good faith, consistent with its practice under all of its percentage rent leases, because it was unable to track actual sales of such merchandise at any of its 400-450 drug stores. The Lease itself was ambiguous in this regard. Brooks’ interpretation of the Lease, while wrong, was not so unreasonable as to evidence fraud. The final claim of error was Brooks’ exclusion of all third-party prescriptions. This was error. It was contrary to the clear and unambiguous language of the Lease. Nevertheless, the Court concludes that it was simply an error. The Lease was the only lease Brooks had ever encountered which required third-party prescriptions to be included in Gross Sales to the extent of any third-party payor payments received during the lease year. All of Brooks’ other leases with percentage rent clauses excluded all third-party prescription sales from the percentage rent provisions. While Brooks should have known that the Lease was different from all of its other leases in this respect, the Court concludes that its failure to recognize the difference does not amount to fraud.
The same six errors were claimed for Lease year 1992. No additional discussion, therefore, is required regarding these errors.[9] There is an additional error claimed for 1992; i.e. the inclusion of credit card fees. This was also an error. However, it is an item so small as to be inconsequential. Its exclusion is not evidence of fraudulent intent.
The Court concludes that Astro was barred from asserting any claims of error or mistake with respect to the certified statements of Gross Sales for Lease years 1991 and 1992. In any event, as noted in footnotes 8 and 9, no percentage rent was due for either year.
B.The Discrepancy Between Gross Sales as Stated in the Weekly Sales Reports and as Stated in the Home Office Worksheets
Astro used the higher figures stated in the home office worksheets to recalculate percentage rent. The Court has found that the difference was attributable to third-party prescriptions rejected or adjusted by third-party payors. Since Astro has also added back into Gross Sales, for purposes of recalculating percentage rent, the entire amount of all third-party prescriptions sales during each Lease year, it would be double counting to add the amount of this discrepancy in as well. These adjustments for Lease years 1993 and 1994 were, therefore, improper.
C.Sales of Candy, Hard Candy, Tobacco and Direct Vendor Deliveries
Brooks’ method of estimating sales of candy, hard candy, tobacco and direct vendor deliveries was contrary to the terms of the Lease. No evidence was offered of any recalculation of these sales based upon the “inventory method,” although inventories were taken and such figures were presumably available to Brooks. Indeed, no evidence of the amount of such sales was offered, other than the full retail value of shipments and the suggestion that it be adjusted by a small percentage for shrinkage. Brooks conceded that, as the Plaintiff alleging overpayment of rent, it has the burden of proving the amount of percentage rent actually due for the years at issue. (Revco’s Post-Trial Memorandum of Law, pg. 2.) Having concluded that the method used by Brooks was improper, the Court has no basis for recalculating the amount properly to be deducted from Gross Sales. Brooks has therefore failed to meet its burden of proof.
D. Subway Sales
As previously discussed, Brooks properly excluded Subway sales from Gross Sales.[10]
E. All Other Items
Brooks has not contested any of the other adjustments to Gross Sales made by Astro for the Lease years 1993 and 1994. These other adjustments are the inclusion in Gross Sales of bad checks/debts, thirdparly prescription sales, credit card fees and (for 1994 only) Peter Pan sales and commissions.
Recalculation of Gross Sales for 1993, based upon the above conclusions of the Court, results in Gross Sales of $3,404,461.00. Percentage rent is payable under the Lease on $404,461.00 in the total amount of $10,111.53.
Recalculation of Gross Sales for 1994, based upon the above conclusion of the Court, results in Gross Sales of $3,813,705.00. Percentage rent is payable under the Lease on $813,705.00 in the total amount of $20,342.63.
Total percentage rent payable for 1991, 1992, 1993 and 1994, therefore, was $30,454.15. Brooks paid percentage rent for those years, under protest, in the total amount of $94,483.00. Brooks has overpaid rent in the total amount of $64,028.64.[11]
III ASTRO’S CLAIM FOR POSSESSION
The Court next addresses Astro’s claim for possession of the Demised Premises. As the above discussion makes clear, Astro was indeed owed percentage rent as of October 20, 1994, although considerably less rent than claimed by Astro. Astro, therefore, acted within its rights under the Lease as construed by the *509 Court, by sending a 15-day notice of default to Brooks on October 20, 1994, entering the Demised Premises and terminating the Lease on November 9, 1994 for nonpayment of percentage rent and instituting and pursuing to conclusion an action for possession of the Demised Premises. That, however, is not the end of the matter. Brooks maintains that termination of the Lease, under the circumstances of this case, constitutes a forfeiture of the Lease which equity should prevent. The Court agrees for the following reasons:
First, Part 21 of the Lease, relied upon by Astro to terminate the Lease, was incomplete as written, and, therefore, ambiguous. Brooks’ position that Part 21 was void for vagueness and that its rights, therefore, were governed by Chapter 186, Section 11 A, was not unreasonable, although ultimately rejected by the Court. Under Chapter 186, Section 11A, Brooks timely cured any default.
Second, Brooks correctly believed that the amount of percentage rent claimed by Astro was grossly overstated. The Court has found that Astro overstated rent owed by more than three hundred percent. Brooks had been calculating Gross Sales for percentage rent purposes the same way since it first became the Tenant under the Lease. There had never been any inquiry or complaint. Without any prior discussion or comment, Brooks was sent a letter, which, for the first time, challenged the manner in which Brooks had always calculated percentage rent. Brooks determined that it had understated Gross Sales, but not by an amount remotely approaching that claimed by Astro. Brooks responded with an offer of compromise. To Brooks’ surprise, Astro responded by terminating the Lease and insisting upon payment in full. Two days after the Lease was terminated, Brooks paid the full amount of Astro’s claim. Brooks had mistakenly considered Astro’s October 20, 1994 letter to be an invitation to negotiate, rather than an inflexible demand for payment in full within 15 days, upon penalty of loss of the Lease. Given the histoiy between the parties, including, in particular, the lack of any previous dispute between them, the substantial disagreement over the amount owed and the ambiguities in Parts 21 and 33 of the Lease, Brooks’ mistake is understandable. As soon as Brooks comprehended that Astro was unwilling to negotiate and was intent upon terminating the Lease, unless paid in full, Brooks paid the claim in full. There was no evidence of any prejudice to Astro from payment six days after the fifteen-day period had expired.
Astro, however, contends that equity should not come to Brooks’ aid, because Brooks acted unfairly and in bad faith. Astro submits that Brooks’ nonpayment of percentage rent and certifications of Gross Sales which contained incorrect information were fraudulent. The Court has already rejected a similar argument in the context of Brooks’ claim for overpayment of percentage rent. The Court has found that Brooks’ mistakes were just mistakes, nothing more.
Astro also contends that Brooks deliberately refused to pay rent that Brooks admitted owing, thereby demonstrating bad faith and deliberate noncompliance with the terms of the Lease. The Court rejects this argument as well. Brooks’ offer of $33,158, in its November 4, 1994 letter to Astro, was an offer of compromise, not an admission of liability. For the years 1993 and 1994, Brooks disputed all claims other than third-party prescriptions, credit card fees, bad checks/debts and Peter Pan sales and commissions (1994 only). These items alone would have resulted in $12,639.60 being owed for 1994 and $3,454.68 being owed for 1993, a total of only about $ 16,000 of the approximately $94,000 claimed by Astro. Brooks’ decision to negotiate the entire dispute, without offering unconditional payment of this small sum for one week, was not made in bad faith and does not constitute willful breach of the Lease. If it was a mistake, it was not a mistake which should result in forfeiture of the Lease.
On the other hand, Astro’s conduct, while lawful, was oppressive. The Court finds that Astro believed that the fair rental value of the Demised Premises was well in excess of the rent, including the maximum percentage rent, it was entitled to under the Lease. Indeed, Astro believed that the maximum rent under the Lease was over $200,000 per year below the fair rental value of the Demised Premises. The Court finds that Astro wanted to break the Lease so that it could realize higher rent for the Demised Premises. The Court finds that this was Astro’s primary motivation for requesting the audit. Astro may have suspected that Gross Sales were being underreported and it hoped that the audit would provide a basis for sending notice of default to Brooks which might then permit Astro to terminate or renegotiate the Lease. When, in Burgess’ mind at least, the audit confirmed that Gross Sales had been underreported, Astro, based upon its own interpretation of ambiguous provisions of the Lease, took an extremely aggressive and inflexible stand, refusing to negotiate with its obviously surprised Tenant and positioning itself to terminate the Lease.
This is not to say that Astro terminated the Lease without any basis for doing so, or that Astro claimed unpaid rent in bad faith solely to obtain termination of the Lease. The Court finds that Burgess was genuinely upset by what the audit disclosed and by what he believed to be substantial and deliberate underreporting of Gross Sales by Brooks. This may well have strengthened his resolve to terminate the Lease.[12] Nonetheless, forfeiture of the Lease was what Burgess really wanted from the outset, not simply payment of rent. He employed aggressive, deliberate measures to obtain this result, which, although permitted by the Lease and lawful, could not have been reasonably anticipated by Brooks.
Under these circumstances, the Court concludes that equity is properly invoked by Brooks to prevent forfeiture of the Lease. See Edwards Fine Furniture, *510 Inc. v. Ditullio, 357 Mass. 380 (1969); Howard D. Johnson Co. v. Maddigan, 361 Mass. 454 (1972); In re 29 Newbury Street, Inc., 856 F.2d 424 (1st Cir. 1988). The Court affirms the judgment for Brooks as defendant in Civil Action No. 95-0898.
IV. BROOKS’ CLAIMS FOR ABUSE OF PROCESS AND VIOLATION OF CHAPTER 93A
Brooks alleges that the action for possession was instituted for the ulterior purpose of forcing Brooks to renegotiate the Lease and that this constitutes an abuse of process. The Court disagrees. The Court finds that Astro instituted the action for possession to obtain possession of the Demised Premises, so that Astro could relet the Demised Premises at a market rental. That Astro was willing, or perhaps even anxious, to renegotiate the Lease with Brooks, does not mean that the action for possession was brought solely for that purpose. Astro sought to insure that the Demised Premises would be available for it to lease to whomever offered the best deal. While the action for possession may have provided leverage in any renegotiations with Brooks, this was incidental to Astro’s primary objective of terminating the Lease and reletting the Demised Premises at a fair market rate. The Court concludes that the action for possession was commenced for the purpose for which it was intended and not merely and exclusively to accomplish some ulterior purpose for which it was not designed. See Ladd v. Polidoro, 424 Mass. 196 (1997).
Brooks has also alleged that Astro violated G.L.c. 93A, §2. Brooks seeks damages under Section 11. Astro undoubtedly played hardball with Brooks, posturing for and seeking termination of the Lease relentlessly, aggressively and expeditiously; not primarily because Brooks had breached the Lease, but rather because Astro believed that the rent under the Lease was substantially below the fair rental value of the Demised Premises. Had Astro manufactured a breach of the Lease as a pretext for terminating the Lease, the Court might well conclude that there had been a violation of Chapter 93A. However, Astro did not do that. Instead, Astro went looking for a breach of the Lease where Astro suspected one might be found. It exercised its right to an audit under the Lease. The audit demonstrated that Gross Sales had in fact been underreported and that percentage rent was due. Astro took advantage of ambiguities in the Lease to construe the Lease in a manner that supported a claim of rent approximately three times greater than what the Court has found was actually owed. Although Astro’s interpretation of the Lease was, in the Court’s judgment, wrong in some respects, its interpretation was not without any basis. Astro gave Brooks 15 days’ notice to pay the unpaid rent before terminating the Lease. The Court concludes that Astro acted in accordance with the provisions of the Lease in doing so. When Brooks failed to pay, Astro terminated the Lease, as was its right. The rent was then paid in full, but Astro, nevertheless, commenced and aggressively pursued an action for possession, while continuing to offer Brooks the opportunity to renegotiate the Lease; thereby making clear that its primary objective all along had been to terminate and renegotiate the Lease.
This course of conduct by Astro, while ungentlemanly, was nevertheless entirely lawful and consistent with the Lease. It was the conduct of a rough and aggressive businessman, who believed himself to be trapped in a losing business proposition and who took advantage of the opportunity given to him by Brooks and by the Lease to get out of the trap. Focusing as it must, “on the nature of the challenged conduct and on the purpose and effect of that conduct . . . ,” the Court concludes that Brooks has failed to prove any violation of Chapter 93A by Astro. See Mass. Emp. Ins. Exchange v. Propac-Mass., 420 Mass. 39 (1995).
Although Brooks’ Chapter 93A claim is denied by the Court, Brooks, nevertheless, is entitled to its reasonable attorneys fees as the “successful party” in the action for possession and in the action for overpayment of rent, both of which, the Court concludes constitute “litigation between Landlord and Tenant based on an alleged default of the terms and conditions of the Lease. (Lease, Part 35.) Brooks is to submit within 14 days, affidavits of such fees itemizing each task by attorney, rate, and time spent. Astro shall respond to such affidavits -within 10 days after receipt of them and may request a hearing on the amount of attorneys fees by filing such request with its written response to the affidavits.
ORDER
For all of the above reasons, it is hereby ordered as follows:
(a) #96-127
Count I - judgment shall enter for the defendants, without costs.
Count II -judgment shall enter for the defendants, without costs.
Count III - judgment shall enter for the Plaintiff in the amount of $64,028.84, plus interest from November 11, 1994, costs and attorneys fees to be determined.
(b) #95-898 - the judgment of the District Court is affirmed; the Plaintiff shall take nothing and judgment of dismissal shall enter, with prejudice and with costs. The District Court took no action on Defendants’ counterclaims believing that it was without subject matter jurisdiction. The counterclaims are duplicative of civil action #96-127. The counterclaims, therefore, shall be dismissed, without prejudice and without costs.

 If, as Brooks claims, the parties intended to incorporate G.L.c. 186, § 11A into the Lease, the first sentence of Part 21, to the extent it addresses unpaid rent (as opposed to rent deductions), would be superfluous. Rather, Part 21 manifests an intention to render the cure provisions of Chapter 186, §11A inapplicable by providing in the Lease the maimer in which the Lease may be terminated.

 The Court notes that Brooks stipulated in paragraph 19 of the agreed facts in the Joint Pretrial Memorandum, that “(Plursuant to Paragraph 21 of the lease, the Defendant Reveo *511 had fifteen (15) days within which to pay any unpaid amounts due as rent or the lease could be terminated.” Given the Court’s interpretation of the Lease, it is unnecessary for the Court to address Astro’s argument that this stipulation must be accepted by the Court as a judicial admission by Brooks, whether or not the stipulation was actually offered into evidence.

 Astro contends that such sales are includable. Astro does not argue that the rent paid by Subway should-be includable, if Subway sales are not includable. The Court, therefore, will not address that issue.

 The Sublease between Brooks and Subway does deal explicitly with the calculation of Subway’s percentage rent should Subway sublet the premises. The Sublease defines "Gross Receipts” to include gross receipts by all “tenants of sublessee.” (Exhibit 2B, ¶3B(1).) Such language is conspicuously absent from the Lease.

 The Court need not decide whether this inventoiy method of estimating actual sales is permitted by the Lease, or whether only sales determined by documented actual sales will do. Although Brooks kept inventory records, they were not used by Brooks for calculating the deduction from Gross Sales. No inventory records were provided to Astro during Astro’s audit and none were introduced into evidence during this trial. There was no evidence of inventoiy numbers and no evidence of the dollar value of sales using the inventory method of estimating sales. Even if the inventory method is permitted by the Lease, there is no evidence by which the Court can employ it to recalculate the amount of the deduction from Gross Sales for tobacco, candy, hard candy and direct vendor deliveries in each Lease year at issue.

 Brooks implicitly recognized this by certifying the same statement 15 months later and sending it to Astro. If, as Brooks argues, Astro was barred, on or about October 26, 1993, from appealing any claim of mistake or error in the April 26, 1993 statement, then there was no necessity for Brooks to certify the statement 9 months after October 26, 1993.

 Indeed, if Astro genuinely believed that Brooks was guilty of fraud or bad faith, it is difficult to understand why Astro would invite Brooks to renegotiate the Lease.

 Without inclusion of Subway sales, no percentage rent was owed for 1991, since, even as recalculated by Morton, Gross Sales would not have exceeded $3,000,000. Astro, therefore, was not entitled to the $4,790 it claimed for 1991, even if all the other alleged errors were in fact the result of fraud or breach of a fiduciary relationship.

 As with 1991, the exclusion of Subway sales from Morton’s recalculation of Gross Sales for 1992, reduces Gross Sales below $3,000,000. No percentage rent, therefore, was due in any event.

 Even if Subway sales were includable in Gross Sales, the Court finds that Morton’s method of estimating such sales was unreliable and inappropriate. The only credible evidence of Subway sales was Subway’s uncertified statements of those sales to Brooks, which were presumably relied upon by Brooks in determining Subway’s percentage rent under the Sublease.

 While Astro has requested that it be awarded the costs of Morton’s audit in Astro’s Motion for Directed Verdict, Astro has filed no claim or counterclaim demanding such relief. The Court, therefore, will not consider any such award.

 The Court, notes, however, that Burgess was not so distressed that he no longer wanted Brooks as a tenant. Despite Burgess’ belief that Brooks deliberately underreported Gross Sales and his accusation that Brooks was guilty of unfair and deceptive practices, Burgess continued to offer Brooks the opportunity to renegotiate the Lease. (Exhibits 4 and 17.)